Filed 9/20/13  P. v. Johnson CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055133 |
| v. | (Super.Ct.No. FSB1002027) |
| ROSHADD BERNARD JOHNSON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Kyle S. Brodie, Judge.  Affirmed in part and reversed in part.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Theodore M. Cropley and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant Roshadd Bernard Johnson appeals from his conviction of robbery (Pen. Code,[1] § 211; count 1) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(1); count 2) with associated true findings on enhancement allegations of personal infliction of great bodily injury (§ 12022.7, subd. (a)), offenses committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), and a prison term prior (§ 667.5, subd. (b)).

Defendant contends (1) his robbery conviction must be reversed because the trial court erred by giving the jury a supplemental instruction that robbery could be the natural and probable consequence of assault when the prosecutor had never argued that theory; (2) the trial court erred by failing to instruct the jury on the lesser included offense of theft when there was substantial evidence that the taking of property was an afterthought in an assault arising from a domestic dispute; (3) the enhancements for great bodily injury must be stricken because the evidence was insufficient to establish that defendant personally inflicted great bodily injury; (4) the enhancements for great bodily injury should be stricken because the trial court instructed the jury, over a defense objection, on the group beating instruction when there was insufficient evidence to support that instruction; (5) the gang finding must be stricken because the evidence of the primary activity element was insufficient; (6) the abstract of judgment should be amended to show the correct crime of which defendant was convicted in count 2; and (7) the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

cumulative error doctrine requires reversal. We conclude the trial court erred by failing to instruct the jury on the lesser included offense of theft because substantial evidence supported giving that instruction. We will therefore reverse defendant's conviction of robbery. The People concede the abstract of judgment should be corrected. We find no other errors.

## II. FACTS AND PROCEDURAL BACKGROUND

Defendant had a daughter, S.,[2] with Deantonisha[3] Spencer. At the time of trial, S. was seven years old. S. had lived with defendant's mother from 2005 to 2008. In 2008, Spencer took custody of S., and defendant and Spencer thereafter had disputes about visitation. In 2010, Spencer was living with S. in Louisiana with her fiancé, Sharon Gavins.[4]

In April 2010, Gavins, Spencer, and S. came to California to visit family. On April 26, Gavins, Spencer, De-Antonette Brown (Spencer's sister), and several other of Spencer's family members were at a car shop in San Bernardino owned by a family friend. The group was standing around talking.

Defendant arrived at the car shop. Spencer had not invited him, and she was not happy to see him. Defendant spoke to Gavins and played with S. Defendant told Gavins he appreciated everything Gavins had done for S.; the conversation was friendly.

---

[2] The child is also referred to in the record as R.

[3] Spencer's name also appears in the record as De-Antonish and De-Antonisha.

[4] Gavins's first name also appears in the record as Sheron and Shuron.

3

When defendant had been there for about half an hour, at least five other people arrived, including Harold McKing, Jerry McDowell,[5] Jovan Smith,[6] and defendant's sister, Isha Johnson. Spencer had invited Isha to see S., but she had not invited the men. Gavins did not know any of the men in the group.

Gavins felt uncomfortable after these people arrived, and he started to walk to his truck with Spencer and Brown. Smith or McDowell called out to them; Gavins stopped, and Smith began talking to him. Meanwhile, defendant was holding S. According to Gavins, defendant was about 30 feet away. According to Spencer, defendant was behind Smith and McDowell. According to Brown, defendant was two feet behind McDowell.

Gavins turned to leave, and McDowell yelled out "Hoover" or "This Hoover." McDowell then struck Gavins on the left side of his lip with a closed fist. McDowell may have been holding some object when he did so. Gavins fell to the ground and lost consciousness; he had a large gash on his lip, and his eyes were rolling in the back of his head. While Gavins was on the ground, defendant, still holding S., kicked Gavins in the mouth or "on the right side of his face somewhere between his lips and right underneath his right eye" when Gavins was coming back to consciousness. Gavins again lost consciousness; the next thing he knew, officers and paramedics were attending to him. Gavins was taken to the hospital, where he received 12 stitches in his mouth. He also had

---

[5] McDowell, also referred to in the record as "Half," was charged with and convicted, in a joint trial, of the same crimes and enhancements as defendant.

[6] Smith is also referred to in the record as "Puna" and "Poonah."

another gash, which could not be stitched because it was in the center of his lip, and a laceration underneath his eye.

While Gavins was on the ground, McDowell began digging through his pockets. He took two cell phones, a wallet, money, and Gavins's watch. While he was taking the items, he was yelling, "This is Hoover. You don't mess with Hoovers . . . ." Brown testified that defendant kicked Gavins *after* McDowell had rifled through Gavins's pockets.

Meanwhile, Spencer and defendant began fighting and pushing each other, and defendant put S. down. Isha grabbed S. and tried to take her to McKing's car, but Spencer's aunt stopped her and got the child.

Gavins testified that McDowell's punch had caused an injury to his lip that required stitches. He testified that defendant's kick had caused a laceration under his eye, and that the kick had caused him to lose consciousness again. Spencer testified that the injury to the left side of Gavins's lip was inflicted when McDowell hit him, and the injury underneath Gavins's right eye was caused by defendant's kick.

Police officers interviewed Spencer at the scene. She said she had come to California to see her family and to let defendant see S. She took S. to the car shop in part to visit defendant. While at the car shop, defendant held S. and was trying to leave with her when Gavins attempted to stop him. McDowell got in the middle and struck Gavins. Defendant then kicked Gavins in the face and handed S. to Isha, who tried to leave in a car with her. McDowell took a cell phone from Gavins's pocket, and defendant and

5

McDowell left on foot. Spencer had been having problems with defendant over visitation with S. She never told the police that McDowell had mentioned "Hoover." Brown also spoke to the police at the scene, and she also did not say anything about McDowell shouting "Hoover." Gavins told the police he had lost consciousness after being punched, and he did not remember anything else. He did not mention being kicked.

### A. Gang Evidence

Defendant told Spencer while they were dating that he was an active member of the 107 Hoover gang. Spencer testified that Smith and some of the other men who arrived with him were also gang members.

Officer Jason Heilman testified as a gang expert. The Hoover Criminals gang has about 1,500 members in about nine subsets; the gang originated in Los Angeles, and its main turf was in South Central Los Angeles, but there had been a pattern of relocation to San Bernardino. Officer Heilman testified that in his opinion, based on his investigation of the current case, review of gang cards, and speaking with Spencer, defendant was a member of 107 Hoover, a set of the Hoover Criminals. He believed McDowell was a member of the 5-Deuce set of the Hoover Criminals. The question "where are you from" is used by gang members to size a person up and find out if he or she is in a gang. Officer Heilman testified about three specific crimes committed by Hoover Criminals in San Bernardino: two 2008 convictions of gang members for carrying loaded firearms and a 2008 conviction of another gang member for grand theft.

6

**B. Defense Evidence**

Isha testified she and defendant had known Spencer since childhood. After S. was born, she lived mostly with defendant, Isha, and their mother. When S. was about five years old, she moved with Spencer. On April 26, 2010, Spencer called Isha to say she was in San Bernardino, and they arranged for Isha to see S. Spencer said she had contacted defendant so he could also see S.

Spencer's cousin picked up Isha and drove her to Ninth Street. When they arrived, defendant was there with Smith and McKing, but Isha did not see McDowell. Several members of Spencer's family were there, and they were talking and catching up. Defendant was talking to Gavins and playing with S. The conversation appeared friendly.

After 45 minutes to an hour, Isha heard a scream. She turned and saw Gavins on the ground. Defendant was standing next to Isha playing with S., about 45 feet away from Gavins. Spencer and her aunt ran over to confront defendant. They began pushing and hitting him, so Isha grabbed S. from him. Spencer's aunt snatched S. from Isha, and Isha and the aunt argued. Isha told defendant they should leave, and Isha, defendant, and Smith left in McKing's car. Isha did not see defendant kick Gavins, and she did not see anyone else strike Gavins in the face. Isha did not try to take S. away in a car. Isha denied that defendant had ever been a gang member.

7

## C. Verdicts and Sentence

The jury found defendant guilty of robbery (§ 211, count 1) and assault by means likely to produce great bodily injury (§ 245, subd. (a)(1); count 2), and found true enhancement allegations of personal infliction of great bodily injury (§ 12022.7, subd. (a)) and offenses committed for the benefit of a criminal street gang(§ 186, subd. (b)(1)(C)). The trial court found true the allegation of a prison term prior (§ 667, subd. (b)).

The trial court sentenced defendant to the aggravated term of five years for the robbery, a consecutive three-year enhancement for the great bodily injury, and a consecutive one-year enhancement for the prison term prior. The court struck the punishment for the gang enhancement under section 186.22, subdivision (g) and stayed the sentence for the assault conviction under section 654.

Additional facts are set forth in the discussion of the issues to which they pertain.

## III. DISCUSSION

## A. Failure to Instruct on Lesser Included Offense of Theft

Defendant contends the trial court erred by failing to instruct the jury on the lesser included offense of theft when there was substantial evidence that the taking of property was an afterthought in an assault arising from a domestic dispute.

### 1. Analysis

The trial court must instruct the jury sua sponte on lesser included offenses "when the evidence raises a question as to whether all of the elements of the charged offense are

8

present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351.) Theft is a necessarily lesser included offense of robbery, which has the additional element of taking by force or fear. (*Ibid.*) If the intent to steal arose after the victim was assaulted, the element of force or fear is absent. (*People v. Webster* (1991) 54 Cal.3d 411, 443.) For example, in *People v. Bradford* (1997) 14 Cal.4th 1005, the court held there was evidence that the defendant did not form the intent to steal until after killing the victim to eliminate her as a witness to a sexual assault, and he did not take her wallet and makeup bag until after she was dead. (*Id.* at p. 1056.) The court therefore reversed the defendant's robbery conviction because the jury had not been instructed on the lesser included offense. (*Id.* at p. 1057.)

Spencer told an officer at the scene that she had taken S. to the car shop to visit with defendant. While they were there, defendant "had their daughter and was attempting to leave." Gavins tried to stop defendant, and McDowell "got in the middle and struck Gavins with a closed fist, knocking him to the ground." After McDowell struck Gavins, defendant kicked Gavins in the face while still holding the child. Defendant then handed the child over to Isha, who attempted to leave in a car. Spencer grabbed the child back from Isha; she then looked back and saw Half removing a cell phone from Gavins's pocket. Spencer did not say that anyone had yelled out Hoover before Gavins was struck. Spencer told the officer that she was having problems with defendant about visitation with S., and defendant was "always upset with her because she shares a child with Gavins." Gavins told the officer he did not know what had happened.

9

Under that scenario, the jury could reasonably have concluded that the initial assault on Gavins took place when McDowell intervened after Gavins tried to stop defendant from taking away the child. If it believed that scenario, the jury could have reasonably determined that the intent to remove Gavins's property arose only after Gavins was knocked unconscious, making the crime theft rather than robbery. (See *People v. Webster*, *supra*, 54 Cal.3d at p. 443.) We conclude substantial evidence supported instructing the jury on the lesser included offense of theft, and the trial court erred in failing to give that instruction.

## B. Instruction on Natural and Probable Consequences Doctrine

Defendant contends his robbery conviction must be reversed because the trial court erred by giving the jury a supplemental instruction that robbery could be the natural and probable consequence of assault when the prosecutor had never argued that theory. Because we have determined his robbery conviction must be reversed on another ground, that argument is moot.

## C. Sufficiency of Evidence of Personal Infliction of Great Bodily Injury

Defendant contends the enhancements for great bodily injury must be stricken because the evidence was insufficient to establish that he personally inflicted great bodily injury. Although he concedes the evidence showed he kicked Gavins in the face, he contends the laceration he inflicted by doing so did not constitute great bodily injury.

10

*1. Standard of Review*

When a criminal defendant challenges the sufficiency of the evidence to support a true finding on an enhancement allegation, this court must determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the allegation beyond a reasonable doubt. (*People v. Ochoa* (1998) 19 Cal.4th 353, 413-414.) We review the whole record in the light most favorable to the jury's finding. (*Id.* at p. 413.)

*2. Analysis*

"Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).) The phrase "personally inflicts" means that the defendant himself must have personally and directly inflicted the injury; the statute does not subject an aider and abettor to the enhancement. (*People v. Cole* (1982) 31 Cal.3d 568, 572.) Great bodily injury requires a significant or substantial physical injury; an insignificant or trivial injury does not suffice. (§ 12022.7, subd. (f); *People v. Martinez* (1985) 171 Cal.App.3d 727, 735; *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.)

Spencer and Brown both testified that McDowell's punch caused the laceration to Gavins's mouth, and they saw that the punch caused a large gash on Gavins's lip that required stitches. Both further testified that defendant's kick caused a laceration under the eye. The People introduced photographs of Gavins's injuries. Defendant argues that

11

the above-described evidence established that his kick caused a laceration below Gavins's eye, and that injury was not great bodily injury within the meaning of the enhancement allegation.

Defendant's argument overlooks other evidence that he in fact kicked Gavins in the mouth. Gavins testified that McDowell's blow caused him to lose consciousness and fall to the ground. His next recollection was that he "was coming to, but [he] was kicked in the mouth." He repeated: "After I was struck, I lost conscious [*sic*]. I fell to the ground, and as I was coming back through [*sic*], I was kicked in the mouth." He identified defendant as the person who had kicked him in the mouth with his right foot. After defendant kicked him in the mouth, he again lost consciousness, and the next thing he remembered was seeing officers and emergency personnel attending him. The jury could reasonably conclude that defendant had kicked Gavins in the mouth, and defendant does not dispute that the large gash to Gavins's lip was great bodily injury.

Moreover, a victim's loss of consciousness is sufficient to support a finding of great bodily injury. (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1147-1149 [holding that serious bodily injury as defined in § 243 is equivalent to great bodily injury under § 12022.7, and "a loss of consciousness that constitutes a 'serious impairment of physical condition' is a 'serious bodily injury'"]; *People v. Kent* (1979) 96 Cal.App.3d 130, 136-137.) Gavins testified that McDowell's blow caused him to lose consciousness and fall to the ground. His next recollection was that he "was coming to, but [he] was kicked in the mouth." During cross-examination, he testified he had lost consciousness from

12

McDowell's blow for "probably a few seconds or so." When he was coming to, defendant kicked him, and that caused him to lose consciousness again. Thus, Gavins's testimony supported a jury finding that defendant had caused Gavins's second bout of unconsciousness.

Defendant contends, however, that Gavins's testimony was "so contradicted by the other more credible evidence . . . that it cannot be considered 'evidence which is reasonable, credible, and of solid value.'" Whether the other evidence on which defendant relies was "more credible" was an issue solely for the determination of the jury. And, although Spencer and Brown testified Gavins was unconscious when defendant kicked him, their perception of the events did not necessarily contradict Gavins's testimony that he was coming into consciousness when he was kicked. The jury could properly have reasoned that his consciousness was a subjective state not perceptible to spectators.

We conclude substantial evidence supports the jury's true finding on the great bodily injury enhancement allegation.

### D. Group Beating Instruction

Defendant next contends the enhancements for great bodily injury should be stricken because the trial court instructed the jury, over a defense objection, with a group beating instruction (CALCRIM No. 3160)[7] when there was insufficient evidence to

---

[7] The trial court instructed the jury under CALCRIM No. 3160, in part, as follows:

*[footnote continued on next page]*

support that instruction. He argues CALCRIM No. 3160 may properly be given only when it is impossible to determine which person inflicted great bodily injury.

### 1. Additional Background

Defense counsel objected to instructing the jury with CALCRIM No. 3160, arguing that the instruction on group beatings did not apply because there had been two separate attacks: first, McDowell punched Gavins in the mouth, and second, defendant kicked Gavins below his eye. The trial court disagreed, stating: "[T]here was no specific testimony regarding which injury might have been specifically inflicted by which part of the attack. They are both injuries to the head. They aren't clearly attributable . . . to one of the blows or the other, and it's for that reason that I think the group assault language is appropriately given in this case."

---

*[footnote continued from previous page]*

"If you conclude that more than one person assaulted Shuron Gavins and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Shuron Gavins if the People have proved that:

"1. Two or more people, acting at the same time, assaulted Shuron Gavins and inflicted great bodily injury on him;

"2. The defendant personally used physical force on Shuron Gavins during the group assault;

"AND

"3A. The amount or type of physical force the defendant used on Shuron Gavins was enough that it alone could have caused Shuron Gavins to suffer great bodily injury;

"OR

"3B. The physical force that the defendant used on Shuron Gavins was sufficient in combination with the force used by the others to cause Shuron Gavins to suffer great bodily injury.

"The defendant must have applied substantial force to Shuron Gavins. If that force could not have caused or contributed to the great bodily injury, then it was not substantial."

Spencer testified that defendant kicked Gavins on the side of his face between his lips and his eye.  Brown testified that defendant kicked Gavins in the area of his right cheek, causing a laceration under his eye.  Gavins required 12 stitches to close the laceration in his mouth.  However, Gavins testified repeatedly that defendant had kicked him in the mouth.

### 2. Analysis

As noted, a great bodily injury enhancement under section 12022.7, subdivision (a) applies only to a defendant who personally inflicts injury.  (*People v. Banuelos* (2003) 106 Cal.App.4th 1332, 1336.)  When it is unclear which of multiple assailants actually caused a great bodily injury, an enhancement may be imposed on each of the assailants who used force substantial enough, either alone or in combination, to have caused the injury.  (*People v. Modiri* (2006) 39 Cal.4th 481, 486, 494, 496-497; accord, *People v. Dunkerson* (2007) 155 Cal.App.4th 1413, 1418; *People v. Corona* (1989) 213 Cal.App.3d 589, 594.)  As discussed above, the evidence was unclear as to the specific events that had caused Gavins's injury.  Moreover, by its terms, the challenged instruction applied only if the jury found that more than one person assaulted Gavins, but the jury could not determine which person caused which injury.  We presume the jury understood and properly applied the instruction.  (*People v. Homick* (2012) 55 Cal.4th 816, 853, 861.)

This case is not like *People v. Magana* (1993) 17 Cal.App.4th 1371, in which the court struck great bodily injury enhancements because "the record [did] not contain

15

substantial evidence to sustain the required findings that defendant *personally* inflicted great bodily injury on the [victims]." (*Id.* at p. 1381.) Here, as we concluded above, the evidence *was* sufficient to sustain the jury's finding of personal infliction of great bodily injury.

**E. Gang Enhancement**

Defendant contends the gang finding must be stricken because the evidence of the primary activity element was insufficient.

*1. Additional Background*

During Officer Heilman's testimony, the following exchange occurred:

"Q  Sir, are you familiar with what the Hoover Criminals primary activities are?

"A  Yes.

"Q  And if you could speak to that.

"A  They've . . . been engaged or involved in drug sales, robberies, illegal weapons, possession, murders, and you know, carjackings, violent crimes, those types of things, been involved in burglaries.

"Q  So would you indicate that violence is primarily the activity of this gang?

"A  Yes."

*2. Analysis*

Preliminarily, we question whether defendant has standing to raise the contention; the trial court struck his punishment for the gang enhancement in the interest of justice under section 186.22, subdivision (g), and we are unaware of any future consequence that

16

might flow from the true finding. Nonetheless, we will address the issue on the merits because it is easily disposed of.

Subdivision (f) of section 186.22 defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in . . . subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.)

In *In re Alexander L.* (2007) 149 Cal.App.4th 605, a gang expert was asked to describe the primary activities of the Varrio Viejos gang. The expert responded: "'I know they've committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.'" (*Id.* at p. 611.) On appeal, the court held that the testimony was insufficient to establish the primary activities of the gang, and the court further explained the expert's testimony lacked foundation. (*Id.* at p. 612.) This case is distinguishable from *In re Alexander L.* because

17

Officer Heilman established the foundation for his expert opinions by recounting his extensive training and experience in gang culture and in investigating gang crimes.

In *People v. Margarejo* (2008) 162 Cal.App.4th 102 (*Margarejo*) the court distinguished *Alexander L.* on the ground that the expert in *Alexander L.* "equivocated on direct examination and contradicted himself on cross-examination." (*Margarejo, supra,* at p. 107.) The court in *Margarejo* held that even though the expert witness did not say "primary" when describing a gang's activities, that word could be incorporated into his answer from the question asked him. (*Id.* at p. 106.) The prosecutor asked: "'Now, what are the *primary activities* of the Highland Park criminal street gang?'" (*Id.* at p. 107.) The gang expert responded: "'Their *activities* range from simple vandalism and battery, and can extend all the way to murder. They also include consolidated weapons, carjackings, robberies and a lot of narcotic related offenses.' (Italics added.)" (*Ibid.*) The defendant contended the evidence of the primary activities element was insufficient because the expert did not explicitly state the listed activities were the gang's primary activities. The court rejected that argument, explaining: "Counsel's questions themselves are not evidence, but the question's wording typically is relevant to a reasonable interpretation of the witness's answer. Often it is vital to consider the question to understand *anything* about the answer, as with answers like 'yes.' [¶] Here the jury had ample reason to infer that [the expert's] answer implicitly incorporated the word 'primary' from the question. Ordinary human communication often is flowing and contextual. Jurors know this. Repetitive and stilted responses make up one kind of direct

18

examination, but not the only kind.  [Defendant's] objection here calls for an unreasonably restrictive interpretation of [the expert's] answer, which we respectfully decline." (*Ibid.*)

Defendant argues that Officer Heilman never explicitly testified about the primary activities of the gang.  However, as noted above, Officer Heilman's testimony that the Hoover Criminals had been involved in certain crimes was in response to the prosecutor's question asking him to "speak to" the primary activities of the gang.  The jury could reasonably interpret his response as incorporating that question.  (*Margarejo*, *supra*, 162 Cal.App.4th at p. 107.)  Under the governing standard of review, we must draw all reasonable inferences in favor of the judgment.  We thus conclude the evidence was sufficient to establish that the primary activities of the Hoover Criminals included those listed by Officer Heilman.

### F.  Abstract of Judgment

Defendant contends the abstract of judgment should be amended to show the correct crime of which he was convicted in count 2.  Because we reverse defendant's conviction of robbery, his challenge to the abstract of judgment is moot.

### G.  Cumulative Error Doctrine

Defendant contends the cumulative error doctrine requires reversal.  Because we have found no errors, that doctrine is inapplicable.

## IV.  DISPOSITION

Defendant's conviction of robbery is reversed.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST

Acting P. J.

We concur:

MCKINSTER

J.

MILLER

J.